**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 97-CC-00126-SCT**

*MISSISSIPPI DEPARTMENT OF HUMAN SERVICES*

*v.*

*RAYMOND M. BAUM*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/16/96 |
| TRIAL JUDGE: | HON. WILLIAM F. COLEMAN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  BELINDA J. STEVENS |
| ATTORNEY FOR APPELLEE: | PRO SE |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND RENDERED - 11/12/98 |
| MOTION FOR REHEARING FILED: | 11/30/98 |
| MANDATE ISSUED: | 4/12/99 |

**BEFORE PRATHER, C.J. , ROBERTS AND MILLS, JJ.**

**MILLS, JUSTICE, FOR THE COURT:**

**STATEMENT OF THE CASE**

¶1. Raymond Baum was terminated from employment with the Mississippi Department of Human Services on June 22, 1994. On November 10, 1994, a hearing officer for the Mississippi Employee Appeals Board rendered a decision reinstating him to his former position. The full Board affirmed the hearing officer's decision on August 30, 1995.

¶2. On September 21, 1995, the Circuit Court of the First Judicial District of Hinds County granted the appellant's petition for writ of certiorari. The Circuit Court affirmed the decision of the Mississippi Employee Appeals Board on December 16, 1996. Aggrieved, the Department of Human Services assigns the following issues for error.

**ISSUES**

**I. WHETHER THE MISSISSIPPI EMPLOYEE APPEALS BOARD HAD JURISDICTION OVER THIS APPEAL.**

**II. WHETHER THE HEARING OFFICER'S REFUSAL TO CONSIDER THE APPELLANT'S**

**MOTION TO DISMISS WAS ARBITRARY AND CAPRICIOUS.**

**III. WHETHER THE DECISION OF THE MISSISSIPPI EMPLOYEE APPEALS BOARD WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.**

## FACTS

¶3. Raymond Baum was terminated from his employment as a Child Support Attorney for Region III of the Mississippi Department of Human Services on June 22, 1994. He was an at-will employee. Less than a month later, Mr. Baum filed a Notice of Appeal to the Mississippi Employee Appeals Board alleging that his termination was the result of reverse racial discrimination.

¶4. A hearing was held on November 8-10, 1994 in which a number of witnesses testified for both parties. The Agency's primary witness to testify was its Chief Legal Counsel, Earl Scales. His testimony began with recounting numerous times throughout his tenure that white attorneys had been guilty of either poor performance or failing to follow Agency procedures. In some cases termination was recommended, and in other cases rehabilitative procedures were implemented. Each case was highly fact specific, and was dealt with carefully. Scales testified that in none of these cases was race a cognitive, determinative factor. The disciplinary action given to attorney, Bruce Harris, drew the majority of focus, however, for he was the African-American that Baum alleges was shown racially discriminatory favoritism. The following colloquy traces Scales' handling of the specific circumstances surrounding the corrective action plan implemented for Harris.

Q: Briefly relate to the Hearing Officer the circumstances surrounding Bruce Harris being placed under a corrective action plan.

A: Okay. Uh - Mr. Harris' Senior Attorney, who is a Supervisor, uh - wrote him a letter - a memorandum I do believe he said it had come to his attention - - that certain cases that were allegedly filled out on his 645-A, which is an activity report; that is a report that I am able to track what the staff is doing in the field, what cases they are doing; and that attorney had falsified - uh - certain documents on that 649-A. This was a memorandum from the Senior Attorney to Mr. Harris.

Q: Uh-huh.

A: When I received that, of course, I was shocked by that, and I called Mr. Harris. Mr. Harris at that time had just left State Office because I had put him on a special assignment in the State Office, and I asked him what was the problem. He said, I would prefer to speak to my Supervisor first, and I said, well, fine, because that is the recommended chain, that you deal with your Supervisor and then come up. Uh - and Mr. Harris did talk to Mr. Jones about it, but Mr. Jones said that he was not satisfied at that time that Mr. Harris had not, in fact, falsified those documents. So, I instructed at that point Mr. Jones, who is a Senior Attorney to go and see what documentation that we had that Mr. Harris had, in fact, falsified those documents, because if he had, in fact, falsified them, of course, I would recommend his termination to the Division Director.

Q: Uh-huh.

A: Mr. Harris - uh - Mr. Jones was instructed to go to the Chancery Court's Office and ask the Chancery Clerk if she remembered. The reason that he was instructed to do that, according to Mr.

Jones, Mr. Harris said he, in fact, filed the cases - uh - but when Mr. Jones went to the courthouse, that staff file had the latter part of February on some, and he said, in fact, had March on others. But Mr. Harris still maintained to him that he had, in fact, filed those cases or taken them to the courthouse to be filed. So, I said, it seems like we need to get to intent here, because clearly there's a discrepancy here. And in working in the field, I knew firsthand that you can take cases to the Chancery Clerk's Office, and because we take them in such huge volume, you can take them there, and they'll sit there for a month or so --

Q: Uh-huh.

A: -- until they get around to filing them.

¶5. Because of this discrepancy and Harris' adamant denials of any intent to falsify the documents, Scales and Jones agreed that only a reprimand was necessary for Harris. Thus, the two submitted a corrective action plan to Carolyn Bridgers, the Division Director for Child Support Enforcement. She followed the recommendation and implemented the plan.

¶6. Scales next turned his attention to circumstances leading up to Baum's termination from employment. He testified that the first notice he had received of problems concerning Baum's employment dealt with allegations that Baum was working out of his own home. Scales testified that if these allegations were true, he was determined to remedy the situation because he felt that state policy required an attorney to "work from 8 to 5 in an office and not out of your home." Scales contacted Chester Jones, Baum's supervising attorney, in order to investigate this allegation. Jones confirmed the allegations, but defended Baum's decision to work from home due to a lack of adequate office space in Montgomery County. The two men did decide, however, that Baum should report to an office. Their solution was to assign Baum available office space in Carroll County, since Baum worked that county as well. Thereafter, Jones passed the decision along to Baum, and Baum complied fully.

¶7. Scales then focused his attention on a February, 1992 staff meeting in Madison County. Scales recounted that,

Mr. Baum disagreed with the procedure in which I had recommended that that act [consolidation of orders] take place and was- was very - in that meeting Mr. Baum was very hostile and was very bitter - uh - and he was very vocal, and I'm used to attorneys being vocal. Uh - I thought it was a bit much, but I did not get offended at that point.

\*\*\*

And when the meeting was over, Ms. Bridgers asked me what was the problem, and I told her I did not know the problem that day, why he was being very argumentative, why he was being hostile, and she said, well, the way that it was conducted was [sic]bordered on insubordination. But, again, we talked about it, and I said, well, if he has valid concerns, I'm going to hear those.

¶8. A third problem Scales addressed was a "shouting match" between Baum and child support enforcement officer (CSEO), Teresa Steen, in Montgomery County. Scales testified that Mrs. Bridgers called him about this alleged incident, and asked him to talk to Baum. Scales did as he was asked and Baum responded that "... she [the CSEO] had questioned his professional judgment, and he disagreed with that... and he said he felt compelled to respond...." Scales counseled Baum that the "appropriate thing

would have been to call her to the office or go to her office and tell her he disagreed with that, or better yet, because she had a Supervisor there, to go to the Supervisor and tell her of this worker's ... public display." Baum responded that he felt his public display was justified because his character had been "attacked" in public, and that he would handle the situation in the same manner in the future if were to arise again.

¶9. Taking advantage of the opportunity, Scales turned the conversation with Baum toward other complaints concerning Baum's work performance that had been brought to his attention. He questioned Baum about reports that he was not keeping regular office hours, failing to properly maintain his case files, and requiring the CSEO workers to perform many of his duties. Baum denied all of the allegations and assured Scales that he "... was going to handle the counties as they should be handled, file the cases, uh-work in a cooperative atmosphere with county staff...."

¶10. The negative reports about Baum's work performance did not cease their steady flow to Scales. As a consequence, Scales took the complaints to Carolyn Bridgers and they discussed Baum's future with the Agency. The decision was reached that Chester Jones, Baum's supervisor, should discuss with him the problems surrounding his work performance, and for Baum to submit a corrective action plan within four days. Baum never submitted such a plan. Shortly thereafter, Scales and Bridgers reached the decision that Baum's employment should be terminated. Bridgers remembered their discussion as follows:

> [W]e found that he was not getting along with other workers. They were having -uh- there were a lot of problems in that area, and we had promoted teamwork ....

> ***

> We talked about it, and we were unsure whether he was salvageable or not. Uh - all of these things - uh- kept -- it seemed like one right after another incident would come up. Uh - we were still concerned; had a great concern about whether or not he was on the job from 8 to 5, and taking all of this into consideration, we just felt that it was in the best interest of the Agency if he no longer was a part of the Agency.

¶11. Later in the proceedings, Baum testified that neither Jones nor Scales ever told him to submit a corrective action plan for his work performance. Baum stated that,

> ...Chester just told me, he said, Ray, he said, write a letter to me [concerning the backlog of cases in Carroll County]. He said, get it to me by I think he said Monday or Tuesday. He said, get it to me pretty quick, and there was a tone in his voice that I thought - you know, I thought that Chester, either he, you know, kind of knows something's up, and - uh - you know, it was a tone I had never heard before.

¶12. The ruling of the hearing officer reads as follows,

> Three days I've listened to the testimony, and the facts appear to be that - uh - Mr. Baum is an at will employee of the Mississippi Department of Human Services as a staff attorney, and that he has no proprietary rights in his position; however, he does have the right that everyone else has under a contract, to not be discriminated against on the basis of race, religion, color, creed, or now disability, and that he has alleged - in his pleadings he has alleged racial discrimination.

> ***

It appears to me that there was an intent either on the part to treat Mr. Baum different from the treatment that was afforded Mr. Harris, and - uh - I find that the Department in this instance did discriminate against - against Mr. Baum, and ... by failing to provide him with the same treatment that they provided Mr. Harris.

## DISCUSSION

### I. WHETHER THE MISSISSIPPI EMPLOYEE APPEALS BOARD HAD JURISDICTION OVER THIS APPEAL.

¶13. Baum argues that the circuit court was correct in finding that the EAB acted within its scope of authority. Specifically, Baum contends that Miss. Code Ann. § § 25-9-127 and 25-9-131 (1972) combined with our holding in *Gill v. Mississippi Department of Wildlife Conservation*, 574 So.2d 586 (Miss.1990), give the EAB authority to hear an attorney's grievances whenever a case of racial discrimination is alleged. We stated in *Phillips v. Mississippi Veterans' Home Purchase Board*, 674 So.2d 1240, 1242 (Miss.1996) that,

> We have addressed § 25-9-127 in the context of whether a probationary employee enjoyed rights in his employment such that he could complain of his dismissal. In *Gill*, we affirmed the circuit court's interpretation of § 25-9-127(b), holding that it does not purport to deny probationary employees the right to appeal to the EAB. It merely denies these employees the protection of good cause or inefficiency for adverse action. This is equally true for employees excepted under subsection (a). Therefore, this section does not bar the EAB from hearing Phillips' claim.

¶14. Baum possesses this right to be heard as a staff attorney for the Department of Human Services. Although he was hired on an at-will basis, he is still an attorney employed by the state. As such, he is a non-state service employee. Miss. Code Ann. § 25-9-107 (c)(xiii) (Supp.1997). It is the policy of the state personnel system "[t]o assure fair treatment of applicants and employees in all aspects of personnel administration without regard to... race...." Miss. Code Ann. § 25-9-103 (e) (1991). If an attorney employed by the state alleges that racial discrimination has taken place, he enjoys the procedural right to appeal the action terminating his employment to the EAB, insofar as that action may have been racially motivated. *See* Code Miss. R. 46 000 001-501 (1997); *Gill*, 574 So.2d at 592. After all, there would be no way for the hearing officer to determine if Baum had a valid complaint of racial discrimination without some kind of hearing giving him the opportunity to present evidence. *Mississippi Forestry Comm'n v. Piazza*, 513 So.2d 1242, 1249 (Miss.1987). The EAB had jurisdiction to hear Baum's appeal of this matter.

### II. WHETHER THE HEARING OFFICER'S REFUSAL TO CONSIDER THE APPELLANT'S MOTION FOR SUMMARY JUDGMENT WAS ARBITRARY AND CAPRICIOUS.

¶15. The Mississippi Rules of Civil Procedure are inapplicable in administrative proceedings. *State Oil & Gas Bd. v. McGowan*, 542 So.2d 244, 246-47 (Miss.1989); *Booth v. Mississippi Employment Sec. Comm'n*, 588 So.2d 422, 427 (Miss.1991). Therefore, the motion for summary judgment, as delineated in Mississippi Rule of Civil Procedure 56, is inapplicable in a hearing before the Employee Appeals Board. As we stated in *Gill*, "... whether EAB may go forward turns on a fair reading of the employee's claims which must be taken as true." *Gill*, 574 So.2d at 592.

¶16. In the case *sub judice*, Baum claims that as a result of his race, he was terminated from employment with the Department of Human Services. The facts as Baum stated them in his notice of appeal before the EAB read as follows:

> I have served as Staff Attorney for over four years and never had any complaints about my job performance from my supervisor. Indeed, my performance had always been alluded to in glowing terms. Upon being assigned to Carroll County last August, it became apparent that the caseworker would not be effective in assisting me in obtaining Court Orders like the caseworkers in the other counties I handled were. She is an African-American, as is the Chief Legal Counsel, against whom the instant appeal is prosecuted. Further, Mr. Scales, the Chief Legal Counsel, had previously been assigned Carroll County when he was a Staff Attorney, and has a close relationship with the caseworker. I was never informed of any problem with my work product until June 17, 1994 when my supervisor told me there was a problem with Carroll County according to Mr. Scales and that I should write a memo regarding the same. I was summarily fired on June 22, 1994 by letter from Greg Phillips, DHS Executive Director, and was given no reason for my termination. However, another attorney recently assigned to Region III was performing poorly, and I am told, this attorney was not showing up for work, and was not filing accurate reports reflecting the true work he was doing, and he was given six months probation. He is also an African-American. I hereby assert that I have been discriminated against based upon my race, which is white, and the obvious disparate treatment of Region III attorneys.

¶17. Accepting all of Baum's allegations as truth, the hearing officer is faced with a case of disparate treatment that could be construed from the circumstances as racially motivated. Only a hearing could determine whether this assumption was in fact truth. Therefore, the hearing officer was justified in proceeding forward with a hearing in order to determine whether Baum's termination was unlawful.

## III. WHETHER THE DECISION OF THE MISSISSIPPI EMPLOYEE APPEALS BOARD WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶18. A prima facie case of reverse discrimination consists of proof that the claimant (i) is a member of a protected group; (ii) he was qualified for his position; (iii) that despite his qualifications he suffered an adverse employment action; (iv) and the position remained open while the employer continued to seek applicants from persons of complainant's qualifications. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 n. 6(1981).[(1)] If the claimant is successful in this minimal showing, he will have created a presumption that the employer unlawfully discriminated against him. *Id.* at 254. Conversely, if the claimant fails to set forth a prima facie case he is not entitled to judgment in his favor.

¶19. Assuming that the claimant meets his initial burden of presenting a prima facie case, the employer is then faced with the burden of producing evidence that the adverse employment actions were taken "for a legitimate, nondiscriminatory reason." *Id.* The need for the employer to present such evidence, of course, necessarily requires an adequate forum to defend his action. And in such a forum, the claimant always bears the ultimate burden of persuading the hearing officer that he or she was the victim of intentional discrimination. *Id.*

¶20. In the case *sub judice*, Baum's prima facie showing included that he was a white attorney that performed admirably in the courtroom. However, he never made a claim that any other attorney was sought to take over his caseload. In fact, Earl Scales appeared to indicate that no attorney has been selected to

replace Baum. The trial transcript reads,

> Q: As the result of losing an attorney in Region III, what kind of effect has that had on Mr. Jones' [Baum's supervisor] - uh - workload?

> A: It is a requirement of all State Senior Attorneys, as Mr. Jones is, to assume those duties and responsibilities until such time as those positions can be filled. So, he would have to take over Carroll, Montgomery, and Attalla, or assign those. He do [sic] have Staff Attorneys that may assist him, but it is his duty to insure that those counties are covered.

¶21. An extensive review of the record reveals no evidence that even hints that Mr. Scales, or any other person with authority over Baum in the Department of Human Services, terminated Baum's employment based upon the whiteness of his skin. The evidence is in fact overwhelming to the contrary.

¶22. Earl Scales' recommendation to terminate Baum's employment was closely scrutinized by both the Division and Executive Directors of Human Services, who are both white. This fact was recognized by Baum's immediate supervisor, Chester Jones, when he testified that Baum's termination was not a result of racial bias. Not one witness indicated that Mr. Scales had ever shown a proclivity toward racial motivation in the hiring, firing or disciplining of attorneys. The hearing testimony does, however, illustrate that Scales had disciplined a number of white attorneys in the past by placing them on corrective action plans. In sum, even if Baum had been successful in asserting a prima facie case of reverse racial discrimination, he fell far short of carrying the ultimate burden of proof.

## CONCLUSION

¶23. This Court finds that Raymond Baum was justifiably terminated from his employment as an at-will attorney. There is no indication of racial motivation behind his termination and the Agency was well within its authority to so act. Accordingly, we reverse the finding of the circuit court and render the termination of Baum's employment lawful.

¶24. **REVERSED AND RENDERED.**

**PRATHER, C.J., PITTMAN, P.J., ROBERTS AND SMITH, JJ., CONCUR. BANKS, J., CONCURS WITH SEPARATE WRITTEN OPINION. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J., AND WALLER, J.**


### BANKS, JUSTICE, CONCURRING:

¶25. I agree with the result reached by the majority. I write briefly to make two points, one of disagreement and one of emphasis.

¶26. My point of disagreement is with the majority pronouncement in footnote 1 concerning what needs to be shown in a so-called "reverse discrimination" case. The point of departure is with the first prong of the *McDonnell Douglas/Burdine* test which speaks of a "protected class." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248,

252-53 (1981). The suggestion is, in effect, that everyone is a member of a "protected class" in that they are members of some race and that the Equal Protection Clause protects all equally. While it is true that race is a class distinction for which most discriminations are unlawful, the "protected class" spoken of in the *McDonnell Douglas* formula for a prima facie case is a class of persons historically disfavored in the work place. There is no justification for suggesting that one not of a class historically disfavored in hiring has made a prima facie showing of discrimination based solely upon a showing that a person not of her race received the benefit of an employment decision regarding a position for which the complaining person was also qualified. The background circumstances spoken of in *Ulrich v. Exxon Co., U.S.A.*, 824 F.Supp. 677, 683 (S.D. Tex. 1993), and elsewhere, are not so much "additional" or representative of a "heightened standard" as they are a substitute for the universally accepted fact of historical disfavor which serves as the basis for the "protected class" prong of the *McDonnell Douglass* test in race cases. *Harding v. Gray*, 9 F.3d 150, 153 (D. C. Cir. 1993). Showing background circumstances suggestive of discrimination is no great hurdle in a valid case. Showing that one is better qualified than one's replacement or the candidate selected, for example, may be sufficient. *Id*.; *Murphy v. Milwaukee Area Technical College*, 976 F. Supp. 1212 (E.D. Wis. 1997). In the end the solution is "not in making an utterly irrelevant factor an element of the prima facie case, but rather in recognizing that the prima facie case requires '*evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion....' Teamsters v. United States,* 431 U. S. 324, 358 (1977)." *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U. S. 308, 312 (1996) (emphasis and brackets in original).

¶27. My point of agreement is that, in the end, this case, based solely upon alleged disparate treatment, falls for the failure to carry the ultimate burden of proving that any different treatment was based upon the forbidden factor of race. That is, Baum was required to present substantial evidence upon which a fair-minded fact finder could conclude that the employment decision was based upon Baum's race. An employee claiming disparate treatment must show that, under "nearly identical" circumstances, the employer accorded preferential treatment to a different class employee. *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991); *Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1180 (5th Cir. 1990); *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. 1982). To be sure, a careful review of the record reflects that both a black and, significantly, some white attorneys were shown to have been treated differently than Baum, in roughly similar, but not identical circumstances. In fact, the record is amenable to the conclusion that Baum was treated somewhat shoddily in terms of the process surrounding his termination. There is no evidence, however, that race was a factor. The presence of a black person as one of the key, and perhaps the most influential, persons in making the termination decision does not change that fact.

## McRAE, JUSTICE, DISSENTING:

¶28. This Court's standard of review in appeals of cases from administrative agencies is limited. We only review the appeal to determine whether or not the order of the administrative agency (1) was supported by substantial evidence, (2) was arbitrary or capricious, (3) was beyond the power of the administrative agency to make, or (4) violated some statutory or constitutional right of the complaining party. *Mississippi Dept. of Envtl. Quality v. Weems*, 653 So. 2d 266, 273 (Miss. 1995) (citing *State Tax Comm'n v. Earnest*, 627 So. 2d 313, 319 (Miss. 1993). I disagree with the majority's conclusion that the decision of the hearing officer and of the Mississippi Employee Appeals Board was not supported by substantial evidence. There is substantial evidence of discrimination against Raymond Baum in this case.

¶29. In concluding that Baum failed to prove that he was discriminated against, the majority considers only

the issue of whether the terminated employee is replaced by another employee who is a member of a different race. The issue should be one of intent, not of effect. However, in reaching its conclusion, the majority substitutes its opinion for that of the hearing officer, who was the finder of fact. The fact finder determined that racial discrimination existed in the disciplinary proceedings of the Department of Human Services. Further, the hearing officer concluded that the ultimate termination of Baum was a product of racial discrimination. The Board's findings echoed those of the hearing officer. Since this Court is not permitted to review these findings de novo, we must give them the utmost deference. *See Mississippi State Bd. of Nursing v. Wilson*, 624 So. 2d 485, 489 (Miss. 1993).

¶30. The hearing officer specifically found that the Department discriminated against Baum by failing to provide him with the same treatment provided to Bruce Harris, and the record supports the hearing officer's finding. Harris was in similar circumstances as Baum and had also been accused of falsifying records. However, Harris was not fired. Instead, he was given a written reprimand, was provided a written corrective action plan, and was given probation. Because Harris and Baum were in similar situations, they should have been treated similarly, and Baum should not have been fired. The hearing officer determined that there was some intent on the part of the Department of Human Services to discriminate against Baum, and the full Mississippi Employee Appeals Board affirmed the hearing officer's decision. This Court should not overlook these facts. Because the majority does, however, I respectfully dissent.

**SULLIVAN, P.J., AND WALLER, J., JOIN THIS OPINION.**


1. Some courts require a heightened standard for establishing a prima facie case of reverse racial discrimination. "In addition to establishing the traditional elements, the plaintiff must also establish background circumstances that support an inference that the employer is 'one of those unusual employers who discriminate against the majority.'" *See Ulrich v. Exxon Company U.S.A., A Division of Exxon Corp.*, 824 F.Supp. 677, 683 (S.D. Tex.1993) (citations omitted). We decline, however, to follow their lead. In our view, the *McDonnell Douglas/ Burdine* scheme is more in keeping with the spirit of the anti-discrimination statutes provided in the Mississippi Code.